**BARTON MINES CORPORATION,**
Appellant and Cross-Appellee,

v.

**COMMISSIONER OF INTERNAL REVENUE,** Appellee and Cross-Appellant.

**Nos. 675–678, Dockets 35382, 35383, 35387 and 35388.**

United States Court of Appeals,
Second Circuit.

Argued April 21, 1971.

Decided July 19, 1971.

Robert S. Ryan, Philadelphia, Pa. (John M. Miller, Jr., Jere R. Thomson, and Drinker, Biddle & Reath, Philadelphia, Pa., and John S. Allee, New York City, on the brief), for Barton Mines Corp.

William S. Estabrook, Tax Div., Dept. of Justice, Washington, D. C. (Johnnie M. Walters, Asst. Atty. Gen., Meyer Rothwacks, and Grant W. Wiprud, Tax Div., Dept. of Justice, Washington, D. C., on the brief), for Commissioner of Internal Revenue.

Before FRIENDLY, Chief Judge, SMITH and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

These appeals involve the calculation of the percentage depletion permitted to Barton Mines Corporation (Barton) which mines ore containing eight to ten per cent garnet by volume and reduces it to garnet grains and powders of 98% purity by means of various processes, designed both to convert the garnet to desired sizes and to attain a purity level dictated by competition in the abrasives industry. At issue is the application of the term "mining" as used in the percentage depletion scheme of the 1954 Internal Revenue Code; and the case involves, for the first time, the amended definition of that term as added by the Public Debt and Tax Rate Extension Act of 1960 § 302 (the Gore Amendment), 74 Stat. 290 (1960), 26 U.S.C. § 613.

Under the percentage depletion scheme a "reasonable allowance for depletion" is allowed as a deduction, in the case of mines, in computing taxable income, 26 U.S.C. § 611(a). The allowance is established in § 613(a) as a specified percentage of "the gross income from the property," at 15% for garnet, § 613(b) (6). The phrase "the gross income from the property" is defined as "the gross income from mining," § 613(c) (1), and "mining" is defined in § 613(c) (2):

"(2) Mining.—The term 'mining' includes not merely the extraction of the ores or minerals from the ground but also the treatment processes considered as mining described in paragraph (4) (and the treatment processes necessary or incidental thereto) * * *."

The parties have stipulated that garnet is not customarily sold in the form of the crude mineral product and, therefore, that the depletion of garnet is governed by sub-paragraph (D) of paragraph (4):

"(4) Treatment processes considered as mining.—The following treatment processes * * * shall be considered as mining * * * :

* * * * *

(D) in the case of lead, zinc, copper, gold, silver, uranium, or fluorspar ores, potash, and ores or minerals which are not customarily sold in the form of the crude mineral product—crushing, grinding, and beneficiation by concentration (gravity, flotation, amalgamation, electrostatic, or magnetic), cyanidation, leaching, crystallization, precipitation (but not including electrolytic deposition, roasting, thermal or electric smelting, or refining), or by substantially equivalent processes or combination of processes used in the separation or extraction of the product or products from the ore or the mineral or minerals from other material from the mine or other natural deposit * * *."

Under sub-paragraph (5) certain processes are specifically excluded from the definition of "mining."

"(5) Treatment processes not considered as mining.—Unless such processes are otherwise provided for in paragraph (4) (or are necessary or incidental to processes so provided for), the following treatment processes shall not be considered as 'mining' : electrolytic deposition, roasting, calcining, thermal or electric smelting, refining, polishing, fine pulverization, blending with other materials, treatment effecting a chemical change, thermal action, and molding or shaping."

The Commissioner asserted deficiencies for the taxable years ending June 30, 1962 through June 30, 1966 on the ground that certain of the processes

used by Barton to convert the raw garnet ore into grains and powders were nonmining processes and were not entitled to the percentage depletion allowance. The Tax Court classified some of the processes as mining and some as nonmining and determined deficiencies totaling $89,796.58 for the taxable years in question, 53 T.C. 241 (1969). Both the taxpayer and the Commissioner have taken appeals from the Tax Court's determinations, the former claiming that the Tax Court erred in classifying some of the processes as nonmining and the latter claiming that all of the processes are nonmining.

The essential facts are not in dispute. Barton was incorporated in 1924 under the laws of the State of New York, with its principal place of business at Gore Mountain, North Creek, New York. It is the only domestic producer of garnet powder, which is used in grinding lenses, manufacturing plate glass and sand blasting, and its grains are the only ones used in the manufacture of coated abrasives (sandpaper). Garnet occurs in the form of round crystals or in pockets several inches in diameter and is encased in or encases other rock materials, chiefly hornblende, feldspar, magnetite and mica. The deposit was first mined by Barton in 1878, and at that time the garnet crystals were set in decomposed rock near the surface and were handpicked out of the surrounding rock. This high-purity garnet was shipped, without further processing, to a Philadelphia manufacturer of sandpaper who crushed the garnet and then sized it for use as an abrasive by passing the crushed garnet over screens with various-sized openings.

The handpicking method of mining continued until about 1924 when the supply of decomposed rock near the surface was exhausted. The remaining garnet crystals were trapped in the hard mass of surrounding rock which had to be separated to render the garnet usable. Garnet has a hardness of 8 to 9 on the Moh's scale (diamond is the hardest with a rating of 10), and the encasing minerals have a hardness ranging from 2.5 to 6.

To be an effective abrasive, therefore, the garnet must be separated from the lower hardness minerals and impurities. In 1924 a mill was built to effect the separation by employing a method of gravity separation. The ore, containing 12% to 14% garnet by volume, was crushed and placed in a jig (a tray with a screened bottom), and the jig was immersed in water and made to pulsate. As the specific gravity of garnet (the ratio of the mass of a given volume of garnet to the mass of an equal volume of water) is higher than the specific gravity of all the impurities except magnetite, the garnet would sink to the bottom and the impurities would come to the top. Using this method of separation, Barton captured about 50% of the garnet from the ore, the other half going off with the impurities. The usable half, termed garnet concentrate, contained 91% garnet and was sold to the large manufacturers of coated abrasives, such as the Minnesota Mining and Manufacturing Company, who prepared it for use as coated abrasives by crushing it and passing it over a screen which reduced the garnet to a size suitable for use on sandpaper and also removed a small amount of the remaining impurities.

During this period a number of small manufacturers of coated abrasives came into being which had neither the technical skill nor the equipment to prepare the garnet concentrate for use as abrasives, and in 1933 Barton acquired a grading or grain mill which crushed and sized the concentrate into grains and raised its purity level. By the late 1930's it had become increasingly difficult to separate efficiently the garnet from the ore because of changes in the physical characteristics of the deposit as the strip mine moved to different levels; and the jig method of separation was no longer adequate. In 1941 Barton adopted a new technique of gravity separation, the heavy media or sink and float technique. Although more efficient than the jig process, it operated effectively only on the larger pieces of garnet (the relative weights of the smaller pieces of garnet

and the impurities were too close for gravity separation to be effective), and much of the garnet was thrown off with the impurities. At the same time much garnet was lost in the waste from the grain mill, which contained about 85% garnet. In 1944, at the suggestion of the War Production Board, Barton introduced a powder mill process to operate on the throw-offs from the grain mill and produce powders. In 1946 it adopted a flotation technique to capture the smaller garnet particles thrown off in the waste from the heavy media tanks. By the end of 1958 the sale of 91% concentrates ended.

Barton's grains were in competition with a number of other products such as corundum, natural and manufactured diamonds, synthetic aluminum oxide and synthetic silicon carbide—all harder than garnet and, therefore, more effective abrasives. Consequently, it became essential that the grains reach a high level of purity to be competitive. As the result of Barton's various processes, it produced a highly pure product—90–92% pure in 1920, 94% pure in 1940, 95% pure in 1944 and 98% pure during the tax years in question. The large manufacturers of coated abrasives discovered that Barton's grading and purifying processes yielded higher purity grains than their own, and, gradually, the sales of 91% concentrate declined, until in 1958 they ceased altogether.

During the tax years in question, therefore, Barton's basic processes consisted of the heavy media tank, the flotation tank, the grain mill and the powder mill.[1] They operated essentially as follows. From the mine, the ore, which contained eight to ten per cent garnet by volume, was transported to Barton's mill where it was placed in a jaw crusher and reduced to a size which would pass through a 1″ to 1¼″ screen (material that did not pass through was subjected to continued crushing until it did). A magnetic separator then withdrew mag-

netite and "tramp iron," and the mixture dropped onto a second screen which separated out pieces in excess of approximately ⅛″ to ¼″. The material (fines) that passed through the second screen was crushed in ball mill No. 1 and then processed through the flotation tank, and the particles which were too large to pass through the screen were processed through the heavy media tank which operated on the theory of gravity separation. The particles were suspended in a liquid, the specific gravity of which was lower than that of garnet, and the garnet sank to the bottom while the impurities floated off the top. In the flotation process, the smaller particles were placed in a tank containing water, and chemicals were added which adhered only to the garnet particles, causing them to be coated with air bubbles and to float to the top. The material emerging from the heavy media and flotation tanks was called "garnet concentrate" and contained 91% garnet by volume. It was, of course, wet and contained oils, grease and flotation chemicals which were introduced during the initial separation processes. The material, carried by a single feed, entered a dryer called dryer "H" where it was heated to an average temperature of 700° F. and sprayed with ferrous sulfate. The heat dried the concentrate and burned off the contaminants, introduced during the flotation and heavy media process, and the ferrous sulphate reacted with the heat to restore color uniformity to the concentrate, which had been streaked by the heavy media process. Ninety-nine per cent of the emerging concentrate (1% went directly to the powder mill) passed through a second magnetic separator where more magnetite was removed and then was processed through the grain mill, where further impurities were removed and the garnet was graded into 17 or 18 commercially usable sizes.

The grain mill consisted of three sets of screens, two air tables and a heat

1. Some of the steps in the processes will be identified by reference to numbers or letters appearing next to the step in a schematic diagram which was an exhibit in the Tax Court and is reproduced at the end of this opinion as Appendix A.

treatment unit. The first set of screens, No. 5, contained five screens which separated the garnet into five group grades, each of which was processed into specific grain sizes. The three largest sizes passed to the air tables which separated out impurities by means of air currents and vibration of the tables, thereby increasing the garnet content from 91% to 93%. This material, plus the two smaller sized groups, then passed to the main screens, the second set of screens in the grain mill (labelled Nos. 6 and 7 in the diagram), which effected the primary removal of impurities from the ore. As described by the Tax Court:

"[L]ighter non-garnet particles of a given size have less tendency to pass through the screens than similar size, but heavier, garnet particles. To efficiently implement the separation the particles being processed through the screens must be graded to very close size. Screens No. 6 consist of several different sized screens which separate each group grade into two feeds for two finished grades; the in-between sizes are rejected. Screens No. 7 grade the garnet grains to reasonably precise sizes."

Fifty per cent of the material passed through the screens and emerged with a garnet content of about 98%. The other 50% had an 85% garnet content and, having resisted separation by screening, served as the chief source of supply for the fluid gravity separation processes of the powder mill.

The material that passed through the screens was subjected to magnetic separation to remove magnetite. Although a small amount (untreated finished grains) then went directly to the final set of screens, No. 8, most of the material went to a revolving cylinder called the capillarity unit, where the material was heated to a temperature of 1600° to 1800° F. The heat treatment restored color uniformity, healed fractures in the grains caused by the initial crushing, produced a tough skin and rounded some of the sharp edges of the garnet. These final screens were termed the scalper screens, and they effected the final removal of im-

purities (consisting primarily of mica), removed any oversized garnet grains, which went to the powder mill along with the impurities, and separated the remaining garnet grains into 17 ultimate sizes of 98% pure garnet, ready for packaging and shipping. The sizes were those set by the National Bureau of Standards to meet the requirements of the coated abrasives industry. Barton also set sizes according to individual customer specification.

The feed for the powder mill was comprised of the throw-offs from the grain mill which had resisted separation there, and had an average garnet content of 85%. The major constituent was the material rejected at the second set of screens Nos. 6 and 7 in the grain mill, but, additionally, it consisted of (1) the small amount of fines coming out of dryer "H", (2) surplus sizes that did not pass through the first set of screens No. 5 in the grain mill, and (3) various other small amounts from the grain mill process. The processes in the powder mill consisted basically of ball mill No. 2 (a rotating cylinder filled with steel blades), a cone dewaterer, "F", and a thickener and classifying separator. The feed passed through a magnetic separator, where magnetite was removed, into the ball mill which crushed the feed into desired sizes, scrubbed the garnet, restored uniformity of color and liberated some impurities. The powder then passed into the cone dewaterer, "F", where the larger particles sank to the bottom and the smaller ones floated. Because the later purification and sizing processes operated effectively only on the smaller particles, the large particles were recirculated back through ball Mill No. 2 for further crushing; and the small particles, which had floated off the top of the dewaterer, flowed past a magnetic separator into a large tank called a thickener. The tank was filled with moving water, and the garnet sank while the impurities floated off the top. The particles that settled in the thickener were pumped into a classifying separator. As described by the Tax Court, the classifying separator

"is a long tube-like device containing approximately 15 successively larger bins set one next to the other. The feed enters the smallest bin first, where a regulated flow of water causes the largest, heaviest particles to settle out at the bottom. The water from the first bin overflows into the next larger bin, where the velocity of the water is reduced somewhat from that in the first bin, with the result that the next smaller powder size settles to the bottom. This procedure is continued through all 15 bins, each containing a successively smaller powder size. At the final bin the impurities flow off the top and are discarded."

The material collected in each bin then flowed to a pan where the garnet settled and more impurities flowed off with the stream of water. The material settling in the pans was dried and placed on a final set of screens, No. 9, which effected a final removal of impurities leaving powders of 98% garnet. They also graded the powders into 15 different sizes ready to be packaged and sold. During the tax years in question the sale of powders accounted for 60% of Barton's revenues, and the sale of grains accounted for the remaining 40%.

The disputed processes consist of dryer "H", the grain mill, the capillarity unit and the powder mill. The Tax Court held that dryer "H" was a mining process in its own right because it effected removal of water and was not specifically excluded from the category of mining— being neither thermal action, roasting or a treatment effecting a chemical change—and, even if it would be characterized as nonmining standing alone, it was necessary or incidental to the heavy media and flotation processes. The Tax Court held that gravity separation was only nominally involved in the grain mill's screening processes and that the screening was principally designed to grade and size the garnet in preparation for the sale of the finished product and was, therefore, nonmining. As exclusively gravity separation devices, the air tables and magnetic separators in

the grain mill were held to be mining processes, but the capillarity unit was held to constitute thermal action or roasting. Except for the magnetic separators, all the processes in the powder mill were held to be nonmining in that they constituted " 'refining' and/or 'fine pulverization.' " For the reasons hereinafter stated, we affirm the Tax Court's classification, as mining, of dryer "H", the air tables and the magnetic separators and its classification of the capillarity unit as nonmining, but we reverse its classification, as nonmining, of the powder mill and the remaining processes in the grain mill.

As found by the Tax Court, the purpose of Barton's processes was to free the garnet from the other rock material in as pure a form as possible and to grade it to the various commercially usable sizes dictated by the abrasives industry. The history of the company shows increasing technological improvements in the purification process required by competitive factors which, during the tax years at issue, would have made it impossible for Barton to market a product that was less than 98% pure, even though as little as four years earlier it had marketed a 91% pure product in ungraded form. Because garnet is heavier than all the surrounding impurities, the methods used by Barton to achieve the level of purity utilized gravity separation techniques and, of course, magnetic separation to remove the magnetite. Of the disputed processes only some actually remove impurities: viz., in the grain mill, the magnetic separators, the air tables and screens Nos. 6, 7 and 8; and in the powder mill, the magnetic separators, ball mill No. 2, the thickener, the classifying separator, and the final screens No. 9. The remaining processes, dryer "H", screens No. 5, the capillarity unit, the cone dewaterer, "F", and the various dryers "K" and "N" in the powder mill remove no mineral impurities found in the raw garnet ore.

Each of the processes that removes impurities does so on a gravity separation theory and is, therefore, a form of

beneficiation by concentration designated in § 613(c) (4) (D) as a mining process.[2] The only distinguishing feature among the separation processes is that some of them (the air tables and the magnetic separators) perform only the function of removing impurities, while the others not only remove impurities but also perform a sizing or grading function. Of the non-separation processes, some of them (screens No. 5, dryer "H", ball mill No. 2 and cone dewaterer, "F") perform functions preparatory to the removal of impurities, and the capillarity unit performs functions that are subsequent to the actual removal of impurities.

The issues presented for review are, therefore, as follows:

I. Whether it is permissible under the statute, § 613(c) (4) (D), to classify some processes as mining and others as nonmining when the only distinction between the various processes is that the former only perform the function of beneficiation by concentration while the latter perform sizing and grading functions as well?

II. Whether the remaining non-separation processes are necessary or incidental to the performance of beneficiation by concentration, and if so, whether they may be included as mining processes?

III. Whether the fact that Barton sold, until 1958, a 91% garnet concentrate precludes classifying any of the processes after the heavy media and flotation tanks as mining processes?

### I.

*The Grain Mill.*

The three sets of screens in the grain mill—screens No. 5, Nos. 6 and 7, and No. 8—remove impurities. The Tax Court treated all three sets of screens together and, applying a "primary-purpose test," held them to be nonmining because they only nominally involved a method of gravity concentration in that the primary purpose of the screening was sizing and grading in preparation for sale. This opinion will treat, in this Part, the application of the Tax Court's test to screens Nos. 6, 7 and 8 and reserve for Part II a discussion of screens No. 5.

Screens Nos. 6 and 7 clearly accomplish beneficiation by concentration as they remove about 5% of the mineral impurities by gravity separation, which is specifically designated as a mining process in § 613(c) (4) (D). Screening or sizing, however, is not so designated. As the only authority for denying mining status to such a dual functioning process, the Tax Court cited Treas.Reg. § 1.613-3 (g) (2) (i), which was promulgated subsequent to the trial of the case. It provides in pertinent part:

"A process (even though otherwise nominally specified as a mining process in § 613(c) * * *) shall not be considered as mining if it functions in any significant degree as a necessary or incidental part of such nonmining processes as refining, smelting, roasting, manufacturing, or packaging, or any other non-mining activity. For example, the crushing and grinding or the loading for shipment of products which have been molded, shaped, or fired shall not be considered as mining."

Assuming this regulation is within the statutory rule-making authority of the Commissioner, it is not dispositive of the present issue. Although it can be assumed that if the primary purpose of screens Nos. 6 and 7 were grading and sizing, the gravity separation that was accomplished would be incidental to that purpose, nothing in the record supports the conclusion that *the primary purpose* of screens 6 and 7 was to grade and size. The record is unequivocally clear that competitive factors dictated a product that approached 100% purity and that

---

**2.** "Concentration" is defined in Treas.Reg. § 1.613-3(f) (3) (i) as "the process of eliminating waste, separating the valuable mineral from the valueless, or separating two or more valuable minerals or ores." Gravity separation is specifically designated a form of beneficiation by concentration in 26 U.S.C. § 613(c) (4) (D).

the grain mill was an efficient means to achieve that result. Sizing is an integral element of the gravity separation techniques employed in the grain mill, and the sizes were planned to coincide with market requirements. We hold, therefore, that clear error was committed in determining that the primary purpose of screens Nos. 6 and 7 was to grade and size.

The Commissioner urges, however, that because the screens removed only a relatively small amount of impurities, as a matter of law they must be classified as only nominally involving a method of gravity separation which was incidental to sizing. The argument is not persuasive. The operation must be viewed as a whole, not each of its elements in isolation. A gravity separation process is no less a method of beneficiation by concentration because it involves twenty elements, each removing 4% of the impurities, rather than one element removing 80%. Moreover, nothing in the statute indicates that an arbitrary percentage should determine which methods constitute beneficiation by concentration, and so construed, the regulation would be without statutory foundation. The relative amounts of impurities removed are relevant to determining the purpose of the screens, as are the other functions they performed but an arbitrary percentage cut-off would serve no useful purpose.

The effect of the decision of the Tax Court is to erect a "solely-for-the-purpose-of-purification standard." Not only is such a standard wholly unrealistic—sizing is an inherent part of most gravity separation processes—but it was specifically rejected by the Congress in 1960 when it passed the Public Debt and Tax Rate Extension Act and amended § 613. The amendment, as offered by Senator Gore, contained the following provision:

"For purposes of this subparagraph, the term 'beneficiation by concentration' means the application of process-es solely for the purpose of eliminating waste, or separating the mineral or ore from other minerals or ores  *  *  *." § 302(b) (3) (c), 106 Cong.Rec. 13216–13217 (86th Cong. 2d Sess. 1960).

This provision was eliminated in the Conference Committee and in its place was substituted the language that is presently contained in § 613(c) (4) (D), with no reference to the "solely for the purpose of eliminating waste" test. The reason given for the deletion was that the amendment, as drafted, would have had "unintended effects in the way of upsetting long-established Treasury practices  *  *  *." 106 Cong.Rec. 14546 (86th Cong. 2d Sess. 1960); see also U.S. Code Cong.Admin.News 2579–2583 (86th Cong. 2d Sess. 1960). The establishment of such a test by means of regulation or court decision would, therefore, directly conflict with the clear evidence of congressional intent and would be invalid.

A further argument against classifying screens Nos. 6 and 7 as mining processes was urged by the Commissioner before the Tax Court but has been dropped on appeal. The Commissioner claimed that the removal of relatively small amounts of impurities constituted "refining," which is specifically excluded from the list of mining processes, §§ 613 (c) (4) (D) and 613(c) (5). This same concept is embodied in Treas.Reg. § 1.613–3(f) (4), which was promulgated subsequent to the trial of this action. It provides in pertinent part:

"A process, no matter how denominated, will not be recognized as mining if the process beneficiates the ore or mineral to the degree that such process, in effect, constitutes  *  *  *  refining, or any other nonmining process within the meaning of paragraph (g) of this section."

Unfortunately, neither the statute nor the regulations defines the term "refining,"[3] and the Commissioner's suggestion that the removal of relatively small amounts of impurities constitutes "re-

---

3. Paragraph (1) of Treas.Reg. § 1.613–3 (g) refers to sub-paragraph (6) of paragraph (g) for a definition of "refining," but no such subparagraph exists in the present regulations.

fining" [4] is inconsistent with the commonly understood meaning of that term in the mining industry, where it is defined as "any process in which impurities are removed from a metal or alloy * *." R. Rolfe, A Dictionary of Metallography, 214 (First American ed. 1955). Not being a metal or alloy, garnet is not encompassed by this definition.

Moreover, even if the Commissioner's suggested definition is appropriate, it is not dispositive in this instance. The Government's own expert witness explained "refining" as "a final purification[,] [a removal of] one or two per cent of the impurities * * * or maybe five per cent." The imprecision of the definition suggests that it is, perhaps, unworkable, but the grain mill, treated as a unit, does not fall within the suggested definition because it removes 7% of the impurities.

■ Screens No. 8 also effect gravity separation, removing the final impurities (consisting principally of mica) from the grains, and what we have held with regard to screens Nos. 6 and 7 applies equally to screens No. 8. Although these screens size the grains into 17 or 18 commercially usable sizes, the fact that impurities are removed by these screens by gravity separation renders them a method of beneficiation by concentration specifically classified as mining under § 613(c) (4) (D). Because screens No. 8 follow the capillarity unit which we hold to be nonmining (*infra* p. 994), it is necessary to reach the Government's argument that any process applied subsequent to a nonmining process is per se nonmining regardless of the function it per-

forms unless the application of the rule discriminates between similarly situated miners of the same mineral. See Treas. Reg. § 1.613–3(g) (2) (ii). The Tax Court rejected this argument as applied to the air tables and magnetic separators and the argument is equally without merit here. Such a provision was specifically deleted from the Gore Amendment before its final passage. Compare § 302 (b) (4) (B), 106 Cong.Rec. 13217 (86th Cong. 2d Sess. 1960) with Conf.Rep. 2005, U.S.Code Cong.Admin.News 2579–2583 (86th Cong. 2d Sess. 1960). Moreover, assuming that Treas.Reg. § 1.613–3 (g) (2) (ii) is a valid exercise of the Commissioner's authority, we think it should operate only to deny mining status to those processes which would otherwise be necessary or incidental to mining but for the intervention of a non-mining process. Those processes which are specifically designated mining under § 613(c) (4) (D), as is gravity separation, are not affected by the prior occurrence of a nonmining process.

■ We hold, therefore, that screens Nos. 6, 7 and 8, as they effect a removal of impurities by gravity separation, constitute an allowable form of beneficiation by concentration; that the sizing coincidentally accomplished does not render them nonmining processes; and that the relatively small amount of impurities removed does not constitute "refining" within the meaning of the statute.

*Powder Mill*

■ The Tax Court held that the powder mill processes were nonmining because "they constitute 'refining' and/or 'fine pulverization.' " To be precise,

4. The very definition of "refining" now urged is the subject of proposed regulation, § 1.613–3(g) (6) (iii), which provides, *inter alia:*
   (iii) The term 'refining' refers to processes (other than concentration processes) used to eliminate impurities or foreign matter from metallic and non-metallic ores and minerals * * *. In general, a refining process is designed to achieve a high degree of purity by removing relatively small amounts of impurities or foreign matter from the

ore or mineral which is subjected to the refining process, whereas a concentration process is designed to separate a valuable mineral from gangue material by removing substantial amounts of impurities or foreign matter, which frequently constitute the bulk of the mineral material subjected to the concentration process."
This proposed regulation is, of course, of no significance to the present appeal, and we express no opinion as to its validity.

whatever fine pulverization occurred did so in ball mill No. 2 where the feed was ground into extremely small sizes,[5] and the remaining processes were preparatory to the sizing and purification which occurred in the thickener and classifying separator.

The powder mill increased the purity level of the powder from 85% to 98%, and this purification was accomplished primarily by gravity separation in the thickener and classifying separator, with a final, small amount of impurities being removed by screens No. 9. What was held earlier with regard to the arguments that screens Nos. 6 and 7 were "sizing" or "refining" applies with equal force to the gravity separation processes in the powder mill. The three processes unquestionably constitute beneficiation by concentration, and the fact that sizing is coincidentally accomplished does not change that classification. Moreover, in removing 13% impurities, the powder mill is more clearly outside the Government's suggested definition of "refining" than the screening in the grain mill. To the extent that the Tax Court's holding that the powder mill constituted "fine pulverization" is taken to apply to *all* the powder mill processes, that designation is misplaced. If fine pulverization occurred, it did so in ball mill No. 2 and that process will be discussed in Part II of this opinion.

## II.

Of the non-separation processes in the grain and powder mills, only one, dryer "H", was classified by the Tax Court as a mining process. None of these processes, standing alone, constitutes beneficiation by concentration or any other process specifically designated by § 613 (c) (4) (D) as a mining process. Their sole claim to "mining" status is that they are necessary or incidental to beneficiation by concentration; and that function would entitle them to mining status under the parenthetical contained in § 613 (c) (2).

The statute provides no definition of the terms "necessary or incidental," and the Tax Court provided no workable definition which drew a distinction between the two terms. In holding the dryer "H" was necessary or incidental to the prior flotation and heavy media processes, the Tax Court relied on what appears to be a causal connection test—a process is necessary or incidental as long as the function performed by the disputed process is causally related to a mining process. More is required, and the two terms have distinctly separate applications. Because of the specificity with which § 613(c) (4) (D) outlines allowable mining processes, a process must be demonstrated to be essential or indispensable to the performance of the mining operation before it may be classified as "necessary." In the present case, therefore, it must be shown that the gravity separation could not occur except for the disputed process, which itself was an integral part of the operation. This accords with the common understanding of the term "necessary," The Random House Dictionary of the English Language 955 (Random House 1966), and no reason has been advanced why this should not apply in the context of mining depletion allowance. The common meaning of "incidental," on the other hand, implies that the process must occur in subordinate conjunction with a mining process, and that it is the coincidental and secondary result of the mining process. *Id.* at 720.

Treas.Reg. § 1.613–3(f) (2) (iii) [6] defines the terms "necessary or in-

---

5. Although the Tax Court found that some impurities were liberated in the crushing, the amount appears to be small, and there is no indication that the impurities were actually removed from the resulting mass. Rather, it appears likely that there was merely a physical separation preparation for the later liquid gravity separation processes. For purposes of the opinion, we will assume that no impurities were separated from the garnet in the course of the crushing.

6. The regulation provides in pertinent part:
"(iii) A process is 'necessary' to another related process if it is essential to the

cidental," and its definition of "necessary" is in fundamental agreement with that outlined above. Its definition of "incidental," however, in addition to allowing for processes that are the coincidental result of mining processes, also includes any process *related* to a mining process so long as its cost is insubstantial in relation to the cost of the mining process. As the statute delegates to the Commissioner the power to define as a mining process "any other treatment process * * * not inconsistent with the * * * provisions of this paragraph," 26 U.S.C. § 613(c)(4)(H), our task is merely to determine if the disparity between the common definition of "incidental" and the Commissioner's is such that it is fundamentally inconsistent with the purpose of the statute. Clearly, it is not and the Commissioner's definition must be applied.

■ Applying these definitions to the disputed processes, it is at once apparent that screens No. 5 in the grain mill, although they remove no impurities, are necessary to the gravity separation function performed by the air tables. The grading of the concentrate into particles of equal size is essential to the effective functioning of the air tables, and screens No. 5 accomplish this purpose. The face that sizing is also a useful market-oriented function is not significant for the reasons given in the discussion of screens Nos. 6 and 7.

■ This leaves for consideration the following processes—dryer "H", the capillarity unit, the ball mill, the cone

dewaterer, "F", and the filters and dryers prior to screens No. 9 in the powder mill. Cone dewaterer, "F", separated out the larger particles emerging from ball mill No. 2 and recirculated them back for further crushing to facilitate the later gravity separation processes. The classifying separator operated effectively only on the smaller particles, and cone dewaterer "F", as it was essential to the performance of the gravity separation, was, therefore, necessary to the performance of a mining process within the meaning of § 613(c)(2). As to the filter and dryers "N" and "K" the Tax Court made no findings as to their being necessary or incidental to a mining process, and the record provides no basis for a finding on the issue. It seems likely, however, that these dryers were not indispensable to the further removal of impurities in screens No. 9; but it is also likely that they were designed to facilitate the subsequent gravity separation performed by screens No. 9, and were, therefore, incidental to a mining process. Under the circumstances we have no recourse other than to remand for a finding on the question of casual relation and for a determination whether the cost of the dryers and filter is insubstantial.

■ The Government argues that, properly classified, the remaining disputed processes are specifically excluded by the statute from being treated as mining processes. It argues that the ball mill is a fine pulverization process and that dryer "H" and the capillarity unit constitute roasting or thermal action.

performance of the other process. For example, if the concentrating of low-grade iron ores to bring to shipping grade and form cannot be effectively accomplished without fine pulverization, such pulverization may be treated as a process which is 'necessary' to the concentration process. Accordingly, because concentration is a mining process, such pulverization is also a mining process * * *. A process is 'incidental' to another related process if the cost thereof is insubstantial in relation to the cost of the other process or if the process is merely the coincidental result of the application of the other process. For example, the use of thawing equipment to unload frozen ore cars at concen-

tration plants will be considered incidental to concentration, where the cost of using such equipment is insubstantial in relation to the cost of the concentration process. Further, where crushing of a crude mineral is treated as a mining process, the production of fines as a by-product is ordinarily the coincidental result of the application of a mining process. If a taxpayer demonstrates that a particular process is necessary or incidental solely to a process named as a mining process in section 613(c)(4) or this paragraph, the necessary or incidental process will also be considered a mining process."

Since roasting and thermal action are specifically excluded from the class of mining processes by § 613(c) (4) (D) and § 613(c) (5) and fine pulverization by § 613(c) (5), the Government argues that they cannot be classified as mining processes even if otherwise necessary or incidental to mining processes. The argument is not persuasive for two reasons. First, application of the term "roasting" suffers from the same lack of statutory definition as did "refining," and the Government's suggested definition—"the application of heat to effect a significant or desire change in the ore or mineral"—overlooks the crucial point, recognized by the Tax Court, the "significant change" must be defined in terms of a chemical change in the mineral. P. Thrush et al., A Dictionary of Mining, Mineral, and Related Terms, at 931 (United States Government Printing Office, Bureau of Mines 1968). "Thermal action" has no statutory, regulatory or dictionary-of-mining definition, and, although the Government urges a definition which is equivalent, in effect, to *any application of heat*, the Tax Court apparently treated it as generically the same as roasting, and likewise requiring a chemical change. We agree.[7]

■ Second, even if dryer "H" and the capillarity unit constitute roasting or thermal action, they are entitled to be classified as mining processes if they are necessary or incidental to gravity separation. Section 613(c) (2) makes it clear that any process necessary or incidental to processes classified as mining in § 613 (c) (4) (D) has mining status and the exclusion in § 613(c) (4) (D) of "roasting" and "refining" is subject to the "necessary or incidental" provision of § 613(c) (2). There is no reasonable distinction to be drawn between the exclusions contained in § 613(c) (4) (D) and those contained in § 613(c) (5), and the regulations make clear that even if a process constitutes fine pulverization,

which is specifically excluded by § 613 (c) (5), it will be classified as a mining process if it is necessary or incidental to a mining process, note 6, *supra*.

■ The ball mill was indispensable to the purification accomplished in the classifying separator. The purpose of the powder mill was to liberate, by more precise processes the garnet that had resisted separation in the grain mill. It was essential to the liquid gravity separation techniques in the powder mill that the particles be as small as possible, and the ball mill achieved that result. It was, therefore, essential to gravity separation and was necessary to the performance of beneficiation by concentration.

■ The Tax Court held that dryer "H" was necessary or incidental to the flotation and heavy media processes, but it is quite clear under the definitions set forth above that dryer "H" was not essential or indispensable to any gravity separation process. Relative to the heavy media and flotation processes which took place prior to dryer "H", the drying, removal of grease, oil and flotation chemicals, and restoration of color uniformity were not essential to, nor did they aid, the removal of impurities. These functions, however, were related to the prior removal of impurities in that each was designed to act on the results of the prior processes. That relatedness is not enough, however, to qualify dryer "H" as incidental. Properly construed, the term "incidental" describes a process that takes place prior to a mining process and, although not essential or indispensable to the mining process, is designed to facilitate its performance. Processes that occur subsequent to mining processes and which remove grease, oil and other contaminants and restore uniformity of color are more properly viewed as designed to facilitate market acceptance and not the removal of impurities. Drying was also accomplished, however, and this was designed to facilitate the subse-

7. The Commissioner has proposed a regulation defining "thermal action" to include the heat treatment of garnet. Proposed Reg. § 1.613–3(g) (6) (vii). That

regulation is of no significance on this appeal, and we express no opinion as to its validity.

quent screening processes in the grain mill which accomplished gravity separation. That function was, therefore, related to concentration processes in the same way that the thawing of frozen ore is incidental to concentration in the example provided by the Regulation defining the term "incidental," note 6, *supra*. Dryer "H" was, therefore, incidental to the grain mill's concentration process, and if the cost was insubstantial relative to the other processes in the grain mill, it qualifies as a mining process under § 613 (c) (2).

The capillarity unit, however, was neither essential to nor designed to facilitate a mining process. It healed fractures on the surface of the garnet grains, produced a tough skin on the grains by the heat reacting with the ferrous sulphate, rounded some of the sharp edges and restored color uniformity; and Barton's brief alleges that it also cleaned the grains. All these functions looked solely toward the market and were neither essential to nor designed to facilitate the removal of impurities. As none of the functions performed by the capillarity unit is specifically designated as a mining process in § 613(c) (4) (D) it is unnecessary to determine whether the Tax Court was correct in holding that it constituted "roasting" or "thermal action." Since it was neither necessary nor incidental to a mining process, it is not entitled to be classified as a mining process.

### III

The Government relies on one further argument in support of its position that dryer "H" and all the processes thereafter applied are nonmining processes. It contends that the legislative history of the 1960 Gore Amendment and the policies expressed by the Supreme Court in United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581 (1960), demonstrate that as a general policy the depletion allowance should be based on the income of the raw mineral product if commercially marketable in that form. Because Barton marketed the 91% concentrate until 1958, the Government argues that

garnet is commercially marketable at that point and no process applied thereafter should be classified as mining. We disagree.

Prior to the 1960 passage of the Gore Amendment, § 613(c), Title 26, U.S.C., provided that:

"(2) Mining.—The term "mining" includes not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products * * *."

This provision had been construed to allow integrated miner-manufacturers to compute the depletion allowance based on the gross income from the sale of the manufactured product. See e. g., United States v. Cherokee Brick & Tile Co., 218 F.2d 424 (5 Cir. 1955) (selling price of burnt brick not raw clay); Dragon Cement Co. v. United States, 244 F.2d 513 (1 Cir.) cert. denied, 355 U.S. 833, 78 S.Ct. 50, 2 L.Ed.2d 45 (1957) (selling price of finished portland cement not the raw cement rock). The bases for these extensions of the depletion allowance were the findings that the minerals could not profitably be sold in their crude state and that the first point at which the minerals could be commercially marketable at a profit was after they had been converted into the end products, brick and cement.

The Supreme Court rejected the rationale of these cases in United States v. Cannelton Sewer Pipe Co., *supra*, which involved an integrated miner-manufacturer which mined fire clay and shale and manufactured them into sewer pipe and other vitrified clay products. The lower courts found that the company could not profitably mine and sell its clay and shale in the raw form and that sewer pipe was the first commercially marketable mineral product. The Supreme Court rejected the profits test of marketability and held that because 60% of the fire clay produced in Indiana during the tax years at issue was marketed in that form, raw clay and shale were the first commercially marketable min-

eral products, even if they were not marketable at a profit in that form. It stated that once the mineral is ready for industrial use and consumption the mining stage ends and manufacturing begins. Earlier in the opinion, the Court stated that its reading of legislative history left it with the conclusion that

> "Congress intended to grant miners a depletion allowance based on the constructive income from the raw mineral product, if marketable in that form, and not on the value of the finished articles." 364 U.S. at 86, 80 S.Ct. at 1586.

Simultaneously with the Supreme Court's consideration of the *Cannelton* case, Congress was considering the Gore Amendment. The primary purpose of the amendment was to eliminate the "commercially marketable test" from § 613 and thereby overturn the judicial extension of depletion to manufactured products. The Government now urges, and the Tax Court held, that the applicable provisions of the present statute must be construed in light of *Cannelton* and that the analysis therein of "commercially marketable" operates as a gloss on the present statute even though the test was eliminated by the Gore Amendment.

The Government's position is not persuasive. Even were we to assume that the "commercially marketable" test must operate as a gloss on the present statute,

that test, as construed by *Cannelton*, would not operate to erect a mining cutoff point at the production of 91% concentrate. The record is quite clear that after 1958 Barton had no market for the 91% concentrate and that the lack of market was caused by the more efficient competitive abrasives. In addition, both the pre-Gore Amendment statute and the present statute distinguish between minerals that are normally marketed in crude form and those, like garnet, that are not. The former class of minerals is entitled to fewer allowable treatment processes than the latter, and the clear legislative policy is to allow depletion only on the treatment processes designed to bring the crude mineral product "to shipping grade and form." § 613(c) (4) (C). In *Cannelton* the Court specifically found that the clay and shale were customarily sold in the crude form, and it is with reference to such class of products that the Court recounted the legislative policy to grant depletion based solely thereon. D. Fernald, Gross Income From Mining: A Critique of Cannelton, 23 N.Y.I.Fed. Tax. 1379 (1965). No reported case has ever denied mining status to an extractive process designed to remove the valuable mineral from the worthless gangue;[8] and the Sixth Circuit has rejected an argument similar to that now urged by the Government in a case involving tax years prior to 1960, Dow

---

8. Subsequent to the Supreme Court's decision in *Cannelton*, numerous cases were decided which dealt with pre-1960 tax years and which applied therefore, the pre-Gore Amendment statute. Although the Commissioner succeeded in urging that certain processes applied to the mineral be classified as nonmining, e. g., the grinding of quartz into flour, grinding of limestone into various sizes for various uses and the processing of rock into lightweight aggregates, none of these cases has involved processes that removed commercially unusable impurities and purified the mineral to a level dictated by competition. See Solite Corp. v. United States, 375 F. 2d 684 (4 Cir.), cert. denied, 389 U.S. 841, 88 S.Ct. 70, 19 L.Ed.2d 104 (1967); Iowa Limestone Co. v. United States, 365 F.2d 63 (8 Cir. 1966); United States v. Light Aggregates, Inc., 343 F.2d 429

(8 Cir. 1965); Morton Salt Co. v. United States, 316 F.2d 931, 161 Ct.Cl. 640, cert. denied, 375 U.S. 951, 84 S.Ct. 442, 11 L.Ed.2d 312 (1963); Virginia Greenstone Co. v. United States, 308 F.2d 669 (4 Cir. 1962); Riddell v. Victorville Lime Rock Co., 292 F.2d 427 (9 Cir. 1961); Commissioner of Internal Revenue v. Halquist, 291 F.2d 49 (7 Cir.), cert. denied, 368 U.S. 930, 82 S.Ct. 367, 7 L.Ed.2d 193 (1961); Standard Realization Co. v. United States, 289 F.2d 247 (7 Cir. 1961). For a case under the pre-Gore Amendment statute classifying as mining the processes used to reduce chemical grade limestone to eight distinct sizes (including finely ground powder) even though there was no showing that the processes removed mineral impurities, see Bookwalter v. Centropolis Crusher Co., 305 F.2d 27 (8 Cir. 1962).

Chemical Co. v. Commissioner of Internal Revenue, 433 F.2d 283 (6 Cir. 1970). Applying the pre-Gore Amendment statute as interpreted by *Cannelton,* therefore, the court held that in the absence of a showing of a market for natural brine, the extraction of the constituent minerals of brine should be considered mining processes under § 613(c) (4) (D), because brine was considered an ore not normally marketed in the crude form.

Moreover, the problem dealt with in *Cannelton* is of a completely different magnitude than the one before us at this time. Barton is not an integrated miner-manufacturer and the extractive processes resulting in 98% pure grains and powders bear a much closer relation to the mining of garnet ore than the production of sewer pipe bears to the mining of clay and shale. Although the powder and grain mill performed market-oriented functions by sizing the grains as well as removing impurities, these processes did not convert the garnet into a wholly new product as did the manufacture of sewer pipe in *Cannelton* and the manufacture of cement in *Dragon Cement, supra.*

There is no indication, however, that Congress intended the Gore Amendment to incorporate the gloss on the statute added by *Cannelton.* The *Cannelton* decision was announced the same day, June 27, 1960, that the Conference Committee presented its report with the revised amendment to each House of Congress. There is no mention of the decision in the House of Representatives' debates on the amendment, and, although the Senate inserted the decision in the Congressional Record, 106 Cong.Rec. 14511–14513 (86th Cong.2d Sess. 1960), there is no indication that the Senate adopted its rationale. The structure of the amendment makes it clear that Congress intended the Gore Amendment to be a specific designation of those processes that would be considered as mining. Congress intended that processes which either removed or aided in the removal of impurities would be classified as mining, and consistent with this purpose, it deleted a provision of the original draft

which would have limited depletion to processes applied solely to remove impurities; and it expanded the original draft, which would have allowed processes *necessary* to mining, to include those *necessary or incidental* to mining. Conf.Rep.No. 2005, 2 U.S.Code Cong. Admin.News 2557 (86th Cong.2d Sess. 1960).

The Commissioner would have this court erect a standard providing for depletion of the cost of arriving at the raw ore only. In the abstract such a standard has much to commend it. In § 613(c), however, Congress has chosen to distinguish between minerals normally sold in the form of the crude mineral product and minerals that are not sold in that form. With respect to the latter, it has allowed as mining processes those that separate the valuable mineral from the waste. We are bound to follow that policy choice.

To recapitulate, we hold that the Tax Court correctly classified the magnetic separators, in both the grain mill and the powder mill, and the air tables as methods of beneficiation by concentration and that dryer "H" is incidental to the gravity separation performed by screens Nos. 6 and 7 if its cost is insubstantial. Screens Nos. 6, 7 and 8 are mining processes and, without reaching the question whether the capillarity unit constitutes "roasting" or "thermal action," we hold it to be a nonmining process because it is neither necessary nor incidental to a gravity separation.

As to the other disputed processes, we reverse the Tax Court and hold that the classifying separator, thickener and screens No. 9 in the powder mill are methods of beneficiation by concentration, that screens No. 5 are necessary to the gravity separation performed by the air tables and that ball mill No. 2 and cone dewaterer "F" are necessary to the gravity separation performed by the classifying separator and the thickener. With respect to dryers "K" and "N" and the filter prior to screens No. 9, we hold them to be incidental if they facilitate gravity separation and their individual costs are insubstantial.

Reversed and remanded to the Tax Court to determine whether dryers "K" and "N" and the filter facilitate gravity separation and the cost of dryers "H", "K" and "N" and the filter, and to re-determine the deficiencies in accordance with this opinion.