**RANCHERS EXPLORATION AND DEVELOPMENT CORPORATION, Plaintiff–Appellee,**

v.

**UNITED STATES of America, Defendant–Appellant.**

No. 78–1789.

United States Court of Appeals, Tenth Circuit.

Argued March 11, 1980.

Decided Nov. 21, 1980.

488

William S. Estabrook, III, Atty., Tax Division, Dept. of Justice, Washington, D. C. (M. Carr Ferguson, Asst. Atty. Gen., William A. Friedlander, Gary R. Allen and Grant W. Wiprud, Attys., Dept. of Justice, Washington, D. C., and R. E. Thompson, U. S. Atty., Albuquerque, N. M., of counsel, with him on the brief), for defendant–appellant.

J. W. Bullion, Dallas, Tex. (Emily A. Parker, also of Thompson & Knight, Dallas, Tex., and Paull Mines of Poole, Tinnin & Martin, Albuquerque, N. M., of counsel, with him on the brief), for plaintiff–appellee.

Before HOLLOWAY, DOYLE and LOGAN, Circuit Judges.

LOGAN, Circuit Judge.

This is an appeal by the United States from a district court judgment granting Ranchers Exploration and Development Corporation (Ranchers), the operator of an open pit copper mine, a substantial tax refund. The government appeals only from the trial court's conclusion that the solvent extraction and electrowinning processes employed by Ranchers in producing copper during the tax years at issue are mining processes under § 613(c) of the Internal Revenue Code (I.R.C.), 26 U.S.C. § 613. Subject to certain limitations, the Code allows as a deduction for depletion 15% of the company's gross income attributable to "mining" of copper. I.R.C. §§ 611(a), 613(a), (b)(2)(A).

I

■ Ranchers purchased the Bluebird Mine, an open pit copper mine located in Miami, Arizona, in 1964. Ranchers initially employed a cementation process to produce copper precipitates, commonly referred to as copper cement. Copper oxide ore from the mine was piled in large leach heaps over which an acid solution was sprayed and allowed to percolate through the heaps. The acid would dissolve some of the copper and produce a copper sulfate solution which was collected in ponds at the bottom of the heaps. Copper cement was then precipitated out of the leach solution by the introduction of iron, usually tin cans. In the cementation process, iron under electromotive force provided the two electrons required by each copper ion in the copper sulfate solution to precipitate an atom of copper metal. The copper cement produced at the Bluebird Mine had to be smelted and refined in order to produce copper satisfying commercial wire bar standards. While Ranchers used the cementation process it claimed and was allowed percentage deple-

tion upon its gross sales of copper cement at the Bluebird Mine.

By 1968 the production of copper cement at the Bluebird Mine had become uneconomic. Iron sulfate, a by–product of the cementation process, had constantly plugged the heaps, forcing Ranchers to abandon them without recovering all of the copper. Ranchers abandoned the cementation process in 1968 and became the first company in the world to install commercial solvent extraction/electrowinning facilities for the recovery of copper.

The processes employed at the Bluebird Mine following installation of the solvent extraction and electrowinning facilities may be described as follows. Copper oxide ore is extracted from the open pit mine and piled in leach heaps. An acid solution of approximately 20 grams per litre is sprayed on top of the heaps. The acid percolates through the heaps and the leach solution is collected in a pond at the base of the heaps. The leach solution, a weak copper sulfate solution containing approximately 2.9 grams of copper per litre, is then introduced into a two–stage solvent extraction process.

In the first stage, referred to as the extraction stage, the solution flows countercurrent to an organic solution, a mixture of an organic extractant and an organic carrier (kerosene) that does not mix with water. The organic extractant contains hydrogen ions, and is highly selective in extracting copper and rejecting all other metals except a small amount of ferric iron. The exchange of copper ions in the copper sulfate solution with hydrogen ions in the organic solution causes copper to be transferred to the organic solution.

The organic copper solution is then subjected to the second part of the solvent extraction process called the stripping stage. The solution is mixed with a copper sulfate solution, which has already been used as an electrolyte in the electrowinning process. In the stripping stage the copper in the organic stream is attracted to the sulfate ion in the electrolyte solution and the hydrogen in the electrolyte solution is attracted to the organic stream. As a result, a copper sulfate solution containing approximately 36.2 grams of copper per litre flows from the solvent extraction facility and enters the electrowinning facility.

The electrowinning facility consists of 48 tanks or cells that are located in the electrowinning tankhouse. Each cell contains 40 cathodes and 41 anodes submerged in the copper sulfate solution. The anodes are made of insoluble antimonial lead. The cathodes, or so–called "starter sheets," are made of copper and weigh about 10 pounds each. The passage of a direct electrical current between the anodes and the cathodes causes the copper in the concentrated copper sulfate solution to precipitate from the solution and deposit upon the starter sheets. After eight days, the cathodes, weighing 130 to 140 pounds each, are removed from the cells, washed, bundled and shipped for sale.

Ranchers claimed percentage depletion for its tax years 1968 to 1971 based upon the gross sales of the electrowon copper cathodes produced at the Bluebird Mine less the gross sales of purchased copper and starter sheets. The Internal Revenue Service, however, determined that all mining processes ceased at the point the leach solution collected in the pond at the base of the leach heaps; it instructed Ranchers to apply the proportionate profits method to calculate its gross income from mining at that point.[1]

Section 611 of the Internal Revenue Code allows as a deduction in computing taxable income from mining a reasonable allowance

---

1. If taxpayer sells the copper after application of only mining processes, percentage depletion is allowed with respect to gross sales of the copper produced. If nonmining processes are applied before the sale, gross income from mining must be determined under the representative market or field price method, providing a price can be established; otherwise the calcula-

tion is normally by the proportionate profits method. Treas.Reg. § 1.613–4 (1972). If the government is correct in its assertion that mining ceases at the point the leach solution collects in the pond, apparently no one disputes the applicability of the proportionate profits method.

for depletion. I.R.C. § 613 establishes the amount, in the case of copper, as 15% of "the gross income from the property," subject to certain limitations not applicable here. The term "gross income from the property" is defined by section 613(c)(1) as "the gross income from mining." Section 613(c)(2) in turn defines "mining" as including "not merely the extraction of the ores or minerals from the ground but also the treatment processes considered mining described in paragraph (4) (and the treatment processes necessary or incidental thereto)."

Section 613(c)(4)(D) states with respect to copper that the treatment processes considered mining are

> crushing, grinding, and beneficiation by concentration (gravity, flotation, amalgamation, electrostatic, or magnetic), cyanidation, leaching, crystallization, precipitation (but not including electrolytic deposition, roasting, thermal or electric smelting, or refining), or by substantially equivalent processes or combination of processes used in the separation or extraction of the product or products from the ore or the mineral or minerals from other material from the mine or other natural deposit;

Section 615(c)(5) specifies that certain treatment processes are not considered mining

> Unless such processes are otherwise provided for in paragraph (4) (or are necessary or incidental to processes so provided for), the following treatment processes shall not be considered as "mining": electrolytic deposition, roasting, calcining, thermal or electric smelting, refining, polishing, fine pulverization, blending with other materials, treatment affecting a chemical change, thermal action, and molding or shaping.

The district court, sitting without a jury, held that the solvent extraction and electrowinning processes employed by Ranchers at its Bluebird Mine are treatment processes considered as mining under § 613(c)(4)(D) of the Code. It determined that the solvent extraction process is substantially equivalent to "beneficiation by concentration," and that electrowinning is a

"precipitation" process. *See* I.R.C. § 613(c)(4)(D). In addition, the district court determined that solvent extraction and electrowinning are necessary to the mining process of leaching employed by Ranchers at the Bluebird Mine. *See* I.R.C. § 613(c)(5).

## II

The government argues Congress intended to allow only those processes utilizing essentially physical means of separating valuable metal from valueless gangue to qualify as "beneficiation by concentration" or its equivalent under I.R.C. § 613(c). It points out that the examples in the parenthetical clause are, with one exception, physical processes technically distinguishable from the chemical procedures employed by Ranchers in its solvent extraction process. We do not accept that limitation, in part because one of the examples, amalgamation, admittedly involves chemical procedures.

We also note that before 1960, I.R.C. § 613(c)(2) allowed for depletion purposes "the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products." Int.Rev. Code of 1954, ch. 736, § 613(c)(2), 68A Stat. 208. By changing the language when it adopted § 613(c)(4)(D), Congress did not intend to alter the fundamental principles of prior depletion law, but sought to eliminate the increasingly prevalent practice of allowing percentage depletion on gross income derived from the finished products of integrated miner manufacturers. *See Barton Mines Corp. v. Comm'r*, 446 F.2d 981, 994–95 (2d Cir. 1971).

■ We agree with the Tax Court's conclusion in *Barton Mines* that "although section 613(c) lists processes which shall and shall not be considered as mining, a mechanical application of the statutory language was not intended; . . . Rather, it is necessary to determine the function served by the particular process in question." *Barton Mines Corp. v. Comm'r*, 53 T.C. 241, 254 (1969), *aff'd in part, rev'd in part*, 446 F.2d

981 (2d Cir. 1971). Congress identified those treatment processes traditionally considered mining and simply added the language "or by substantially equivalent processes" to provide flexibility [2] in permitting the implementation of new technology "*in the separation or extraction* of the product or products from the ore or the mineral or minerals from other material from the mine or other natural deposits." I.R.C. § 613(c)(4)(D) (emphasis added).

Finally, the term "concentrating" is defined by the Treasury's own regulations as "the process of eliminating *substantial amounts* of the impurities or foreign matter associated with the ores or minerals in their natural state, or of separating two or more valuable minerals or ores, without changing the physical or chemical identity of the ores or minerals." Treas.Reg. § 1.613–4(f)(3)(i) (1972) (emphasis added). The government would consider the Ranchers' solvent extraction process to be "refining," a prohibited process under § 613(c)(5). The term "refining" as it is defined in Treas.Reg. § 1.613–4(g)(6)(iii) (1972) embraces those

> processes (other than mining processes designated in section 613(c)(4) or this section) used to eliminate impurities or foreign matter from smelted or partially processed metallic and nonmetallic ores and minerals, as, for example, the refining of blister copper. In general, a refining process is designed to achieve a high degree of purity by removing *relatively small amounts* of impurities or foreign matter from smelted or partially processed ores or minerals. (Emphasis added.)

We are not persuaded that Ranchers' solvent extraction process, which removes 90 to 95 percent of the impurities from the copper sulfate leach solution, is a refining process. The copper sulfate solution has not been previously smelted and is not a partially processed ore or mineral within the meaning of the regulations. The first solid metal product resulting from the extraction process must still be refined before the copper meets commercial standards.[3] The solvent extraction process, thus, is best characterized as a concentrating process which eliminates "substantial amounts" of the impurities from the ore in its natural state. We conclude that Ranchers' solvent extraction process is substantially equivalent to "beneficiation by concentration" and therefore is an allowable mining treatment process under § 613(c)(4)(D).

### III

The government similarly challenges the district court's conclusion that electrowinning is a "precipitation" process allowable under section 613(c)(4)(D). The government bases its contention on a literal reading of subparagraph 4(D), which parenthetically excludes electrolytic deposition from the list of acceptable treatment processes, and section 613(c)(5), which specifically identifies electrolytic deposition as one of several treatment processes not considered to be mining.

Although the parenthetical containing the term "electrolytic deposition" follows the word "precipitation," it modifies the entire list of enumerated mining treatment processes. "Roasting," "thermal or electric smelting," and "refining," also listed with "electrolytic deposition" in the parenthetical, are not precipitation processes. Roasting involves the heating of solids to pro-

---

2. Chairman Wilbur Mills of the House Ways and Means Committee, in discussing the "substantially equivalent" phrase in section 613(c)(4)(D), stated: "In view of the shift away from the general reference to ordinary treatment processes to a specifically defined list of treatment processes, *some statutory flexibility was deemed necessary to deal particularly with changes in mining art ....*" 106 Cong.Rec. 14546 (1960) (emphasis added).

3. The copper content of the electrowon cathodes produced by Ranchers at the Bluebird Mine is approximately 99.9 percent. The cathodes, nevertheless, do not meet commercial wire bar standards for copper or qualify as electrolytic copper since they still contain impurities such as lead and sulfur. Consequently, the electrowon cathodes produced at the Bluebird Mine have to be fire refined or electrolytically refined before they can be used in the fabrication of tubing, wire, or other copper products.

mote reaction with gases in the furnace. Thermal smelting consists of those

> processes which reduce, separate, or remove impurities from ores or minerals by the application of heat, as, for example, the furnacing of copper concentrates, the heating of iron ores, concentrates, or pellets in a blast furnace to produce pig iron, or the heating of iron ores or concentrates in a direct reduction kiln to produce a feed for direct conversion into steel.

Treas.Reg. § 1.613–4(g)(6)(ii) (1972). Finally, refining is defined as a process that eliminates impurities or foreign matter from smelted or partially processed ores and minerals. Treas.Reg. § 1.613–4(g)(6)(iii) (1972).

Each process listed in the parenthetical, with the exception of electrolytic deposition, is applied to an existing metal or partially processed solid ore. Electrolytic deposition, by contrast, is the common element in a number of processes including electrorefining, electroforming, electroplating and electrowinning. The first three respectively refine, form, and manufacture new final products from solid metallic feed stock, whereas electrowinning is essentially a precipitation process by which metal is recovered from a solution by electrolysis. U. S. Dept. of Interior, A Dictionary of Mining, Mineral and Related Terms, 378–81 (1968).

I.R.C. § 613(c)(4)(D) suggests, in the context of its history, that all treatment processes employed in the copper industry lie on a continuum, with obvious mining functions at one end and incontrovertable refining functions at the other. At some point along the continuum mining stops and manufacturing starts. Read literally, section 613(c)(4)(D) appears to assign processes involving electrolytic deposition to the manufacturing end of the continuum. Nevertheless, we cannot accept such a literal construction as the will of Congress.

As discussed above, the Code, after the Gore Amendment, retains the functional approach to depletion despite its seemingly exhaustive list of processes considered to be mining. As to those minerals, including copper, "which are not customarily sold in the form of the crude mineral product," I.R.C. § 613(c)(4)(D), it allows as mining not only the enumerated processes but also substantially equivalent processes necessary or incidental to the separation of minerals from other material extracted from the mine. See I.R.C. § 613(c)(5). In adopting the Gore Amendment, Congress did not intend to eliminate existing acceptable mining processes. Chairman Mills reminded his colleagues in the House that "[t]he list of these specifically included processes retains all of the processes specifically allowed in present law and in addition the treatment processes necessary or incidental to the specifically named processes." 106 Cong.Rec. 14546 (1960). Ranchers utilized cementation to precipitate copper from the leach solution prior to 1969 and was allowed percentage depletion on gross income attributable to the cementation process. Cementation is not a process listed in I.R.C. § 613(c)(4)(D), yet the government admits that Congress did not intend to eliminate cementation as an allowable mining treatment process.

The district court heard conflicting expert testimony on the equivalence of cementation and electrowinning and concluded that electrowinning, like cementation, is a precipitation process involving electrolytic deposition. The court determined that the two processes are distinguishable only as to the source of the electromotive force necessary to supply the two electrons required by each copper ion in solution to precipitate one atom of copper metal. It would be unreasonable to conclude that Congress intended to exclude electrowinning, an equivalent precipitation process utilizing electrodeposition, simply because the source of the electromotive force is different. The resolution of conflicts between experts as to the description and function of technical processes is peculiarly a matter for the determination of the trier of fact, see *Riddell v. California Portland Cement Co.*, 297 F.2d 345, 351 (9th Cir. 1962); we accept the district court's determination that electrowinning is the functional equivalent of cementation in Ranchers' mining operation.

The Treasury regulations also guide us to the conclusion that the electrowinning processes used by Ranchers should be classified as mining. Treas.Reg. § 1.613–3(f)(4) (1972), which paraphrases § 613(c)(4)(D), emphasizes function and purpose in categorizing treatment processes as either mining or manufacturing. The regulation encapsulates § 613(c)(4)(D) as follows:

Cyanidation, leaching, crystallization, and precipitation, which are listed in § 613(c)(4)(D) as treatment processes considered as mining, and the processes (or combination of processes) which are substantially equivalent thereto, will be recognized as mining only to the extent that they are applied to the taxpayer's ore or mineral for the purpose of *separation or extraction of the valuable mineral product or products from the ore*, or for the purpose of separation or extraction of the mineral or minerals from other material extracted from the mine or other natural deposit. A process, no matter how denominated, will not be recognized as mining if the process beneficiates the ore or mineral to the degree that such process, in effect, constitutes smelting, refining, or any other nonmining process within the meaning of paragraph (g) of this section. (Emphasis added.)

The essence of § 613(c)(4)(D), as recognized by the regulation, is that a process constitutes mining if its function and purpose is to separate valuable products from otherwise valueless ore. A process is not considered to be mining if its function and purpose is to remove relatively small amounts of impurities from partially processed ore or minerals. Treas.Reg. § 1.613–3(g)(6)(iii) (1972).

We conclude that the term "electrolytic deposition," as it appears in the parenthetical contained in § 613(c)(4)(D), encompasses only those processes whose function and purpose is equivalent to roasting, thermal or electric smelting and refining, i. e., processes that start with solid metal or partially processed ore and beneficiate the same to a degree that such processes constitute smelting, refining or manufacturing. We hold that electrowinning, as employed by Ranchers, is an allowable mining treatment process since it extracts the first identifiable valuable mineral from the raw ore leach solution.

IV

The trial court also found that the electrowinning process, though using electrolytic deposition, was necessary to the mining process of leaching utilized by Ranchers, taking it out of the category of nonmining processes set forth in § 613(c)(5). We believe that such a conclusion is required by a commonsense analysis. The first treatment process employed at the mine consists of spraying an acid solution on leach heaps containing raw ore, producing a liquid copper sulfate solution containing approximately 2.9 grams of copper per litre. Two more liquid solutions are introduced in stages which upgrade the liquid copper sulfate solution to about 36.2 grams of copper per litre. This increase of copper content must be viewed as eliminating substantial amounts of impurities. At this stage the product is still a liquid copper sulfate solution containing substantial impurities. Electrolytic deposition, like cementation, accomplishes the necessary, final step of precipitating a solid which can be shipped or refined. We would perhaps be inclined to characterize this final step as a refining process if the resulting solid were sufficiently pure to meet commercial standards. But despite the substantial purity of the first solid metal obtained, it must still be fire refined or electrolytically refined before it can be used in the fabrication of tubing, wire or other copper products.

Congress intended that processes which either removed or aided in the removal of impurities would be classified as mining, and consistent with this purpose, it deleted a provision of the original draft which would have limited depletion to processes applied solely to remove impurities; and it expanded the original draft which would have allowed processes *necessary* to mining, to include those *necessary or incidental* to mining. Conf.Rep.No.2005, 2 U.S.Code Cong.Admin.News 2557 (86th Cong. 2d Sess. 1960).

The Commissioner would have this court erect a standard providing for depletion of the cost of arriving at the raw ore only. In the abstract such a standard has much to commend it. In § 613(c), however, Congress has chosen to distinguish between minerals normally sold in the form of the crude mineral product and minerals that are not sold in that form. With respect to the latter, it has allowed as mining processes those that separate the valuable mineral from the waste. We are bound to follow that policy choice.

*Barton Mines Corp. v. Commissioner*, 446 F.2d 981, 996 (2d Cir. 1971).

The processes used by Ranchers, including electrolytic deposition, are mining processes within the spirit and, we hold, the letter of the law permitting depletion.

AFFIRMED.